## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-318-BAH** |
| **KENNETH GIUSINI** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kenneth Giusini to 27 months' imprisonment, three years' supervised release, $2,000 in restitution, and a mandatory assessment of $100.

### I.      INTRODUCTION

Giusini participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Giusini, a 68-year-old ticket taker at the Kimmel Center for the Performing Arts, joined the crowd on the North Terrace and, ignoring screeching alarms, entered the Capitol through the north door. After being pushed out of the Capitol by police, Giusini aggressively shoved his body against police at the north door and then shoved a metal railing at officers.

The government recommends that the Court sentence Giusini to 27 months' incarceration for his conviction of violating 18 U.S.C. § 231. A 27-month sentence reflects the gravity of Giusini's conduct, but also acknowledges his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Joint Status Report filed in this case, ECF 19, and the affidavit in support of the complaint, ECF 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Giusini's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Giusini and his then-girlfriend traveled to Washington, D.C. from Philadelphia. The next day, Giusini and his companion attended the "Stop the Steal" rally and thereafter made their way towards the U.S. Capitol. Though Giusini continued all the way to the Capitol, his companion did not.

Giusini made his way to the North Terrace and, along with a group of other rioters, entered the Capitol through the north door as alarms blared. Officers formed a line in the hallway

preventing Giusini and other rioters from breaching further into the Capitol. Despite ample room to turn around and leave, Giusini stayed in the Capitol apparently filming police until police were able to expel Giusini and the other rioters.



*Image 1: Screenshot from Security Footage, Exhibit 1 at 2:57, showing Giusini (circled in red) filming police blocking Giusini and other rioters from getting further into the Capitol*



*Image 2: Screenshot from Security Footage, Exhibit 2 at 3:32,*
*showing Giusini (circled in red) inside the Capitol with ample room behind him*



*Image 3: Screenshot from Security Footage, Exhibit 2 at 3:59,*
*showing Giusini (circled in red) being forced out of the Capitol*

After being expelled from the Capitol, Giusini remained in the north portico near steps leading down to the North Terrace. Police continued to eject rioters from the Capitol, and a melee ensued. Some rioters fell to the ground and others pushed back against officers. As one rioter used his back to push against an officer, Giusini moved forward and pushed against that rioter, making it harder for officers to eject that rioter from the Capitol.



*Image 4: Screenshot from Body Worn Camera Footage, Exhibit 3 at 00:57,
showing Giusini (circled in red) pushing against a rioter who was refusing to leave the Capitol*



*Image 5: Screenshot from Open-Source Video, Exhibit 4 at 4:57,
showing Giusini (circled in red) pushing another rioter into officers*

He also pushed an officer.



*Image 5: Screenshot from Body Worn Camera Footage, Exhibit 3 at 1:07,*
*showing Giusini (circled in red) pushing an officer with his left hand*

Another officer pulled Giusini back, but Giusini reengaged, first using his back and body weight to push against an officer.



*Image C: Screenshot from Open-Source Video, Exhibit 5 at 00:20,*
*showing Giusini (circled in red) using his back to push against an officer*

Then, as officers tried to back into the building, Giusini turned around and pushed the same officer with his forearm.



*Image 6: Screenshot from Body Worn Camera Footage, Exhibit 3 at 1:16, showing Giusini (circled in red) throwing his body weight into an officer*

As officers continued to try to push rioters back and to close the north doors, Giusini and other rioters then grabbed a metal railing and shoved it at officers.



*Image C: Screenshot from Open-Source Video, Exhibit 5 at 00:34, showing Giusini (circled in red) shoving a metal railing at officers*



*Image C: Screenshot from Open-Source Video, Exhibit 4 at 05:28,
showing Giusini (circled in red) shoving a metal railing at officers*

After rebuffing the railing, police closed one door. Giusini flanked one side of the door while a

rioter tried to hold the other door open.



*Image C: Screenshot from Open-Source Video, Exhibit 4 at 05:37,
showing Giusini (circled in red)*

Shortly after another rioter sprayed a chemical irritant at officers, Giusini walked away from

the door.

9

In a December 2023 interview, Giusini admitted that he entered the Capitol on January 6. He said that he entered an open door with a group of people and that, upon entry, there was only one officer. Giusini opined that police must have called for backup because soon more police arrived and began pushing the rioters out of the Capitol. During the interview, Giusini admitted that he put both of his hands on an officer's chest. He claimed he was telling the officer to wait because he was worried about another rioter who had fallen on the ground. Giusini claimed that he was merely trying to help the rioter who fell and was not trying to hurt the officer.

Giusini minimized his conduct even further when he pled guilty. At that time, he admitted that he "pushed against a rioter who was being expelled by police," ECF No. 19, ¶ 10, but did not admit to pushing an officer. Giusini's attempt to sterilize his criminal offense should, as discussed below, factor into whether he should be specifically deterred from future crime.

## III.    THE CHARGES AND PLEA AGREEMENT

On August 8, 2024, Giusini was charged by information with one count of civil disorder, in violation of 18 U.S.C. § 231. Giusini was convicted based on a guilty plea entered without a plea agreement on August 15, 2024.

## IV.    STATUTORY PENALTIES

Giusini now faces sentencing on one count of civil disorder. As noted by the joint status report and the Presentence Report issued by the U.S. Probation Office, Giusini faces up to 5 years of imprisonment, a supervised release term of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the Guidelines as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

*See* PSR, ECF No. 31, ¶¶ 26-35.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

The PSR correctly notes Section 4C1.1 does not apply in this case because Giusini used violence and credible threats of violence in connection with the offense. PSR ¶ 34. Giusini shoved and thrust a metal railing at officers trying to clear the Capitol of rioters. He did this while the alarm blared and in the midst of a skirmish where rioters around him were also attacking officers. Given the context, Giusini's actions were both violent and posed a credible threat of violence.

---

[2] The cross-reference in U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

*United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12 (noting that the fact that a "defendant is not personally charged with assaulting or attacking officers" is "not sufficient to make him eligible for the zero criminal history score offense-level reduction."). To be clear, the nonapplication of §4C1.1 would exist regardless of whether the Court found that the cross-reference did or did not apply. That is because Giusini's overall actions used violence or the credible threat of violence.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 38. Accordingly, based on the total adjusted offense level, after acceptance

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

of responsibility, at 17, Giusini's Guidelines imprisonment range is 24 to 30 months of imprisonment. PSR ¶ 96.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Giusini's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Giusini was not only part of the larger riot, but he personally used physical force to interfere with police efforts to clear rioters from the building. He, along with other rioters, ignored the blaring alarm and forced his way into the Capitol. He remained inside, despite seeing a line of officers preventing rioters from further breaching the building. Indeed, he only left when police forced the rioters out. After being forced out, Giusini reapproached police first pushing another rioter into them, and then using his body weight to push against officers. And, as police were trying to close the door, Giusini shoved a metal railing at officers. He ignored every sign that he should not be there—the alarm, the officers, the surrounding chaos—and intentionally hindered police efforts to expel rioters from the Capitol. The nature and circumstances of Giusini's offense were of the utmost seriousness, and fully support the government's recommended sentence of 27 months of imprisonment.

**B.  Giusini's History and Characteristics**

Giusini is a 68-year-old man from Philadelphia. He worked as a Parking Enforcement Officer for the City of Philadelphia, and, since retiring, now works part-time as an usher and ticket taker at the Kimmel Center for the Performing Arts in Philadelphia. Giusini had a stable upbringing, has strong family connections, and has a stable employment history. According to his brother, this included very close connections to law enforcement—Giusini's godfather was the Chief Inspector of Police. PSR ¶ 54. Although he has a long history of substance abuse, he has been sober since 2003 when he entered a 12-step program (where he has since sponsored 15 people). Despite the indicia of a stable and productive life, Giusini entered the Capitol during a riot and physically assaulted various police officers, pushing against them, helping shove a metal railing at them, and preventing them from controlling the riotous mob. And he has not fully accepted responsibility for his actions. Thus, these potentially mitigating factors do not warrant a downward variance.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Giusini's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Giusini also weighs in favor of a term of incarceration. Although Giusini has pled guilty, he continues to minimize his conduct on January 6, refusing to admit that he pushed officers during the altercation outside the north door. To this day, Giusini claims that he was merely helping other fallen rioters. But the video controverts this—Giusini repeatedly reengaged with police after being pushed back and continued to try to interfere with officers after fallen rioters had gotten up and moved away, including by shoving a metal railing at officers as they tried to close the north door. Given Giusini's continued attempts to minimize his conduct, a term of imprisonment is important to specifically deter him from future crimes, to impress upon him the gravity of his crime, and to promote respect for the law.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and

weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide examples where courts applied the

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

cross-reference from § 2A2.4(c) to U.S.S.G. § 2A2.2 for aggravated assault where the underlying conviction was a violation of 18 U.S.C. § 231.

In *United States v. Baquero*, 21-cr-702-JEB, the defendant unlawfully entered the Capitol where he joined a group of rioters trying to push police out of the Rotunda, grabbed an officer's hand while police were trying to clear rioters out of the Rotunda, braced his back against a door to the Rotunda to keep the door open, and pushed an officer who tried to pry the defendant from the door. Like Giusini, the defendant was convicted of 18 U.S.C. § 231, and the defendant faced the same guideline range as Giusini. The court varied downward based on the defendant's remorse and work in the community, ultimately imposing a sentence of 18 months' imprisonment. Though Giusini has accepted responsibility by "accepting the elements of the count of conviction," PSR ¶ 24, Giusini has not accepted responsibility for the full extent of his conduct and, as such, the same downward variance is not warranted here.

In *United States v. Caspel*, 22-cr-107-TSC, Caspel was part of a group of rioters who pushed against a police line on the Northwest side of the Capitol and motioned for other rioters to join the group push. Caspel also used social media to encourage others to join the mob. Later, the defendant pushed against a line of National Guard troops. Because of his push, the cross reference to 2A2.2 applied to Caspel's conduct, just as it should to Giusini's. Unlike Giusini, Caspel did not breach the Capitol. And, unlike Giusini, Caspel acknowledged the severity of his actions and admitted to pushing police. The court varied downward, in part because Caspel did not enter the Capitol, ultimately imposing a sentence of 18 months' imprisonment. Here, Giusini both breached the Capitol and will not admit that he pushed police, so a higher sentence is appropriate.

Of course, while the offense of conviction largely drives the § 3553(a)(6) analysis, the gravamen of Giusini's conduct is assault. Thus, there are also several comparators to cases where the court applied the cross-reference from § 2A2.4(c) to § 2A2.2 and the underlying conviction was a violation of 18 U.S.C. § 111.

In *United States v. Ortt*, 24-cr-224-LLA, the defendant assaulted multiple officers, including at one point grabbing an officer's baton, to overrun the police line on the West Front of the Capitol. Ortt made inflammatory statements online after January 6, and violated his release conditions. Ortt was convicted of 18 U.S.C. § 111(a) and faced the same guidelines range as Giusini. The court imposed a sentence of 27 months of incarceration. Like Ortt, Giusini actively fought against officers seeking to expel the mob from the Capitol. And Giusini's conduct involves different aggravating factors not present in the *Ortt* case. Unlike Ortt, who did not enter Capitol, Giusini attacked the very officers that had just expelled him from the Capitol. And, unlike Ortt, who admitted to assaulting officers, Giusini has not accepted responsibility for the full extent of his conduct on January 6.

In *United States v. Weeks*, 24-cr-131-BAH, the defendant joined the mob in the Lower West Terrace "tunnel," where he opened one of the doors in the tunnel (which facilitated assaults by other rioters on police), encouraged others to join a group effort to push against the police, and directly pushed an officer after striking out at officers with his arm. Weeks later helped rioters break a window. As a retired corrections officer, Weeks would have had specialized knowledge of what officers were facing. The Court imposed a sentence of 27 months of incarceration. Like Weeks, Giusini engaged in a group effort to try to overrun police, albeit at a different location.

Giusini first pushed against another rioter, aiding that rioter in his attempts to push against the police line. And despite ample room to walk away, Giusini continued to propel his body weight at officers, pushing against them with both his forearm and back. Although Giusini did not have specialized training, his close connections to law enforcement should have given him some perspective on what police were facing. Where Weeks used only his body, Giusini grabbed hold of a metal railing and thrust that at police. And, unlike Weeks, Giusini entered the Capitol. Giusini's conduct is equally serious as the conduct in *Weeks* and warrants a similar sentence.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

§ 3663A(c)(1)(A)(i), or "an offense against property ... including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Giusini was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because Giusini engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Giusini to pay $2,000 in restitution for his convictions on Count One. This amount fairly reflects Giusini's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly

and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

Giusini's convictions for violations of 18 U.S.C. § 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, by refusing to provide the requisite forms, Giusini has not shown an inability to pay,[8] thus under the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $10,000 - $95,000. U.S.S.G. § 5E1.2(c).

---

[8] The PSR concludes that Giusini does not have the ability to pay a fine. PSR ¶ 94. This conclusion, however, appears to be based solely on information provided by Giusini but not on required documentation. *See* PSR ¶ 84 ("Based on the financial information provided by the defendant it does not appear that the defendant has the ability to pay a fine in this matter."); *see, id*. ¶ 90 ("An Equifax credit report could not be generated because the defendant did not return the requisite release form.").

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months' imprisonment, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By: /s/ Anna Z. Krasinski
ANNA Z. KRASINSKI
Assistant United States Attorney
New Hampshire Bar No. 276778
United States Attorney's Office
Detailed from the District of New Hampshire
(603) 451-7851
anna.krasinski@usdoj.gov